## Case No. 14,750.

### UNITED STATES v. CASTRO.

[Cal. Law J. & Lit. Rev. 137.]

District Court. N. D. California. Dec. 10, 1862.

MEXICAN LAND GRANT — OBJECTIONS TO SURVEY.

[1. Where the owners of adjacent ranchos have acquiesced in, adopted, and recognized for nearly 20 years, as the boundary between the ranchos, a certain line established by a government official in the discharge of his duties, and in conformity to which buildings have been erected, and the land cultivated for a long series of

years, one of such owners cannot assert that such line is erroneous.]

[2. The mere execution by a grantee from the Mexican government of deeds of parts of the tract within the exterior boundaries does not show a location of the grant as including the land so conveyed, to be adopted by the court in preference to an election of location shown by the previous erection of a house and corrals on another part of the tract, and by the cultivation of the adjacent land, and residence thereon for a number of years.]

The principal controversy in this case is as to the location of the dividing line between the ranchos of Mariano Castro and Jose Pena. It appears from the expediente that in February, 1841, Jose Pena presented a petition to the governor, alleging that from the year 1837 he had solicited the Rincon de San Francisquito, but that, by various proceedings, which he details, a part of it, and also an augmento he had solicited, had been conceded to other parties. He therefore prays for a new augmentation of his land "from the arroyo de las Yeguas, which is its limit, as far as the first sausal toward the east," and he submits a diseño indicating the boundaries of the tract with the augmento. The augmento thus solicited was included within the general limits of the rancho of "Pastoria de las Borregas," which had been applied for by Francisco Estrada, but had not yet been granted. The inchoate right thus acquired by Estrada was so far respected as to make it necessary that his assent to the grant to Pena should be obtained. The administrator of the mission, to whom the petition was referred, accordingly reports that, "As respects the piece of land, 'Pedazo de Tierra,' which the applicant desires as an augmento, it may be conceded, without prejudice to any one, since, although it is included in the diseño of Don Francisco Estrada, he has agreed, in my presence, to cede it to Don Jose Pena." This agreement Estrada embodied in a written declaration, signed by himself, and attached to the expediente, wherein he obliges himself to cede to Pena "the piece in addition (el pedazo mas de augmento,) as described in his map, and shown on his diseño."

On the 29th March, 1841, the grant issued,—no express reference is made to the augmento,—but the land is described as bounded by that of Don Francisco Estrada. Estrada did not obtain his formal title until the succeeding January. It describes his land as bounded by that of Pena "on the side of the sausal de las Borregas." On the 19th of June, 1843, Ynigo, an Indian of Santa Clara, addressed a petition to the governor, alleging his right to a portion of the land included within the grant to Estrada, for which, as he averred, he had already received documents which had been lost. The governor, with the view of ascertaining how much land was included within the boundaries of the Estrada grant, ordered Sunol, the sub-prefect of the district, to measure the land, after previously notifying Estrada and the Indian Ynigo. This order was complied with by Sunol. His report to the government is found in the archives, and the actual location of the lines run by him is proved by his own testimony, and that of his assisting witnesses. He appears to have fixed some of the boundaries, especially towards the south, arbitrarily, and as convenience dictated,—adopting a road and the crossing of the arroyo Cupertino as part of the boundary, without attempting to run to the line of the rancho of Prado Mesa, with which Estrada's tract is declared in the grant to be "colindante." The western boundary, or the line between Pena and Estrada, he seems to have run with care. It was pointed out to him by Estrada as the line of the augmento which he had agreed to cede; and, though Pena was not present, his son was aware of the proceeding, and witnessed the running of the line.

The testimony is conclusive and uncontradicted that from that day until recently the line thus established has been recognized by both parties, and been notorious among all the neighbors, as the dividing line between the ranchos. At the time this measurement was made Pena had already erected a house to the east of the Yeguas creek, which had been the original western boundary of the Estrada tract. A house had also been erected by Castro, the father-in-law of Estrada, and to whom the latter subsequently ceded all his rights in the immediate vicinity. This house, or rather another, erected in 1849, has continued to be occupied by the family of Castro ever since, and his widow resides in it to this day. The common boundary line of the ranchos was therefore run between the two houses, leaving Pena's house to the west, and within his limits, and that of Castro to the east. The boundary thus established in 1843 remained undisturbed and undisputed until very recently, when certain parties claiming an interest in the Pena grant, derived through the Robles, the assignees of Pena, for the first time urged the pretension that the line is not in accordance with the "linea del augmento" indicated on the diseño.

It is contended that if that line be drawn as there laid down, it will pass far to the eastward of the Sunol line. The quantity thus added to the Pena grant, in addition to that bounded by the Sunol line, will be about 3,000 acres. The line claimed by counsel will be drawn about 2¾ miles to the eastward of the Yeguas creek, and the total augmento, which, on this location we must suppose Pena to have solicited out of the Estrada tract, and Estrada to have consented to cede, would be not less than 4,000 acres, or nearly one square league. In support of this claim, the only evidence appealed to is the "linea del augmento," as drawn on the diseño of Pena. This diseño represents a tract of land bounded on the north by the bay, and on the west by the arroyo de Francisquito; on the east the arroyo de las Yeguas is laid down.

running from the hills toward the bay on the north. The "linea del augmento" appears to commence at a point in the hills to the west of the Yeguas, but, deflecting towards the east, it crosses that creek, intersects a road some distance to the eastward of where the same road is crossed by the Yeguas, and continues in the same direction to the bay. The road referred to is represented as running parallel with the bay, and east and west, from the San Francisquito creek to the eastern limits of the diseño.

BY THE COURT. In the foregoing description the directions referred to are approximately those indicated by actual survey, the compass marks on the diseño being, as usual, incorrect. Along the "linea del augmento" toward its southern end, near the hills, are written the words "Arastradero y Limites." The part of it beyond the point where it crosses the Yeguas is inscribed "Linea del Augmento." It is claimed that the line thus indicated is the line of the arastradero road, which, it is alleged, still exists, and can readily be traced. That that road. or a line nearly coincident with it, was intended to be adopted as far as the Yeguas creek, appears to me plain from the grant and diseño. The point of beginning, viz. "la punta del arastradero," is called for in the grant, and the direction of the line toward the Yeguas does not materially vary from that of the existing road, which Mr. Matthewson, the surveyor, declares to have the appearance of being an old road of the country, and the location of which could not. from the nature of the ground, have been materially altered. But the point where the dividing line crosses the main San Jose road, and its direction thence to the bay, are the real subjects of controversy. It is suggested that this point may be ascertained by comparing the distance along the main road, as indicated on the diseño, from the crossing of the Yeguas to the crossing of the dividing line. with the distance from the crossing of the Yeguas to that of the San Francisquito creek. The diseño seems to show that the dividing line crossed the road at a distance east of the crossing of the Yeguas a little more than one-third as great as the distance along the road between the two creeks.

It is apparent that to determine the location by a measurement of this kind is to attribute to the diseño an accuracy and justness of proportion rarely to be found in the rude map submitted to the governor, and certainly not characteristic of this diseño as is shown by comparing the relative length and width of the tract represented on it with its actual length and width as determined by the natural objects called for.

With a view, however, of ascertaining what. on the theory proposed. would be the location of the dividing line. I have procured, at the surveyor general's office, the measurement to be made. The distance between the Yeguas and San Francisquito creeks is determined by actual survey. If, then, the dividing line be run at the proportionate distance east of the Yeguas, it will be found not very considerably to differ with the Sunol line. It will certainly fall far short of the line contended for by counsel. Another mode suggested of determining the point in question is by comparing the length of the dividing line as indicated on the diseño from the hills or the "punta del arastradero" to where it crosses the Yeguas with the distance from the latter point to where it is represented as crossing the road. I have not attempted accurately to make this comparison. I. have no doubt, however, that the result would be to carry the eastern line considerably to the eastward of the line run by Sunol. The method is obnoxious to the objection referred to,—that it attributes to the diseño a correctness which it evidently does not possess; and, though indications such as these are sometimes necessarily resorted to in the absence of all other modes of determining boundaries, in this case they are evidently not to be followed. But while thus appealing to obscure and doubtful indications of the diseño, the counsel has strangely overlooked the explicit language of Pena's petition and of the grant to Estrada. In the petition the augmento solicited is "from the Yeguas," which is the present boundary, as far as "the first sausalito toward the east." In the grant to Estrada, the ranch of the latter is described as bounded by the lands of Don Jose Pena on the side of the "sausal de las Borregas." On the diseño this sausalito is laid down, and the dividing line is represented as running at a very short distance to the east of it. This sausalito now exists upon the ground, and is readily identified as the first sausal to the east of the Yeguas. It is immediately adjacent to the sheep corral from whence the ranch derived the name of "Pastoria de las Borregas." It is evidently the sausal de las Borregas mentioned in the Estrada grant.

The language of Pena's petition might be construed as intended to exclude the sausalito from the augmento, for he asks only for the land "from the Yeguas as far as the "first sausalito." The diseño, however, would seem to indicate that it was intended to be included. The line run by Sunol passes through the sausal, leaving the larger portion on the side of Pena. As the houses of Pena and Castro were already built, and contiguous to each other, the line was run between them by Sunol, and the intention of the parties, no doubt, substantially carried into effect. The family of Castro have continued to reside in their house to the present day. and the acquiescence of both parties in the dividing line thus established is proved by uncontroverted testimony. If, then, the question were new, and the line were now for the first time to be located by the calls in the grant and diseño, it would not, to any considerable degree, depart from the line estab-

lished by Sunol in 1843. But, even if this latter location were clearly erroneous, yet, on the plain principles of justice and law, it ought not now to be disturbed. It has been established, recognized, and adopted as a boundary line for nearly twenty years. Neither at the time it was run by Sunol, nor at any time afterwards, did Pena make any objection or complaint with regard to it. It was notorious among all the neighbors as the established and admitted line of division between the ranchos. It does not appear that the Robles, who have acquired Pena's interest, even now dispute this line. It is stated in the brief of the counsel for Castro that they acknowledge the line run by Sunol to be the ancient and true boundary between the ranchos. The objection is urged solely by a party who claims to have derived some interests in the rancho through the Robles. That the line, whether or not in precise accordance with the indications of the diseño, was substantially that intended by the parties, is evident from the fact that the house and principal cultivations of the Estrada rancho are immediately adjacent to it. It cannot be supposed that Estrada would have consented voluntarily and without consideration to cede to Pena part of his rancho including his house, his corrals, and comprising, if the line be run as contended for, more than four thousand acres of land, and this under the designation of "un pedazo de tierra," or piece of land,—a term evidently implying a tract of no great extent. That the parties have acquiesced in, adopted, and recognized this line is evident, not only from the direct testimony to the fact, but from the circumstance that in 1849 Castro built a new house near his old one, in which his family have ever since resided. It will not be pretended that he built this house on land which he supposed he had ceded to Pena. The manifest injustice of disturbing a boundary, fixed by long acquiescence and adoption, has been recognized in numerous cases.

In Jackson v. Dieffendorf, 3 Johns. 269, Van Ness, J., says: "Shall a possession of thirty-eight years be disturbed because from a recent survey it appears not to correspond with partition deeds executed sixty years before?" In Jackson v. Van Corlaer, 11 Johns. 123, the parties who owned the land nineteen years before the trial agreed upon the line of division which had repeatedly been acquiesced in, and within ten years they had mutually supported the division fence thus agreed upon. The court refused to disturb the line so established. In Jackson v. Freer, 17 Johns. 31, Spencer, C. J., says: "The patents were issued on the mutual agreement of those interested in the whole tract to secure their common rights, and thus the agreement was carried into complete effect. The survey of the lots and the actual location of them by the joint act of all the parties must control. The map was intended to represent the relative situations and localities of the lots as regarded each other; the actual survey was the practical location." In McCormick v. Barnum, 10 Wend. 104, Chief Justice Savage says: "The line was acquiesced in for more than twenty years. The defendant had early built a house on the premises in question, and the plaintiff's agent must have seen it. This is clearly such a recognition and acquiescence as should bar the plaintiff's claim." In Jackson v. Murray, 7 Johns. 5, the court says: "In all cases of any uncertainty in the location of patents and deeds, courts hold the party to his actual location;" and Chief Justice Thompson, in Jackson v. Wood, 13 Johns. 346, says: "In grants of great antiquity, where the description of the land is vague and the construction somewhat doubtful, the acts of the parties, the acts of the government and those claiming under adjoining patents are entitled to great weight in the location of a grant."

The close analogy which the above cases (and many more might be cited) bear to the case at bar is apparent. With the exception that Pena was not himself present when the line was established by Sunol, the case at bar is at least as strong as any of those cited. That Pena and those claiming under him have for nearly twenty years acquiesced in and recognized the line cannot be doubted. It was established by a government official in the discharge of a duty imposed upon him by the governor. It was treated as fixed by the governor when determining how much land out of the Estrada grant should be given to Ynigo, and Pena or his grantees have suffered a house to be built, and the land to be cultivated for a long series of years, without complaint or objection. This house, and land to the extent of more than three thousand acres beyond the Sunol line, it is now sought to include in the Pena grant. It appears to me that the pretension is wholly inadmissible, and that the boundary between the ranchos as fixed by Sunol is not only in reasonable conformity with the calls of the grant and diseño, but even if it departed from them it ought not now, under the circumstances, to be disturbed. On the part of the claimants it is contended that the measurement by Sunol was a judicial delivery of the possession of the tract, and that the survey should now be made so as to include all the land within those boundaries. The circumstances under which the measurement was made by Sunol have already been adverted to. It is apparent that this measurement had few of the characteristics of, nor was it intended to operate as, a judicial delivery of possession. It was not made by a judge, but by an executive officer. The witnesses were not sworn, the colindantes were not summoned, no judicial record of the proceeding was made, and, what is conclusive, no delivery of the possession with the usual or with any formalities was given. Its object was merely to inform the governor of the extent of

the tract in order to enable him to determine what portion might be conceded to Ynigo, and leave to Estrada sufficient to satisfy his grant for two leagues, a little more or less. The measurement was effected and a grant to Ynigo of much less than he solicited, and supposed to be about one-half of a league in extent, was made. I can see nothing in this proceeding to authorize the extension of the Estrada grant to the exterior boundaries run by Sunol, in great part arbitrarily, and, as he admits, without reference to quantity; i. e. without any intention of measuring off to Estrada the two leagues granted to him, but merely, as the order directs, to ascertain how much land was within the exterior limits. But whether or not this conclusion be right, the point is res adjudicata. The same claim was made to this court when the Estrada grant was before it on appeal from the board of commissioners. It was expressly decided, after argument, that the claim was valid to the extent of two leagues and no more. The validity and effect of Sunol's proceedings as a judicial delivery of possession were discussed at length in the opinion of the court, and the decree restricting the claim to two leagues has since been affirmed by the supreme court. [24 How. (65 U. S.) 346.] It is, therefore, the law of the case.

The recent discovery among the archives of the order to and report of Sunol in no respect alters the legal aspect of the question. But, even if it were otherwise, those records are at most newly discovered evidence, to be submitted to the court in a bill of review, which, under the act of 1851, this court has no jurisdiction to entertain. The decree, therefore, which confirms the claim to two square leagues of land and no more, is final and conclusive.

The location of the two square leagues within the exterior boundaries remains to be determined. It appears that in 1850, Castro conveyed to Jones, who had been acting as his attorney and counsel, a piece of land on the extreme eastern border of the rancho. An attempt has been made to show that this conveyance was merely a grant of the sobrante over and above two leagues, and that it was intended merely as a relinquishment by Castro of his rights in the surplus, in case he should be adjudged to possess any. But the evidence on this point is by parol, and, even if admissible, it is unsatisfactory. At the time of the conveyance there is no reason to suppose that either party doubted the rights of Castro to the whole tract included within what has been called the judicial possession given by Sunol. The deed was, therefore, accepted by Jones as an absolute conveyance in fee simple, and he has conveyed to subpurchasers portions of the land. If, then, Castro were now seeking to make an election so as to exclude the lands sold, it is quite possible that he would be estopped by his deed to declare that the land

conveyed should not be included. notwithstanding that the deed seems to have been made and received under a mistaken notion of his rights. But in fact his election had been made long previously to the date of the deed to Jones. As early as 1843 he had built a house and corrals, and had cultivated lands on the extreme western portions of the tract. In 1849 a new house was erected. and we have seen that as early as 1843 he was present with Sunol, when the latter ran upon the ground his extreme western boundary. In the opinion delivered by this court in the case of U. S. v. Sutter [Case No. 16,-424] it is said: "As against a grantee, or purchasers under him, seeking to exercise the right of election subsequent to and differing from a location already constructively elected by deeds of conveyance, the above reasoning would seem conclusive. But it commonly happens that soon after obtaining his grant, and prior to any conveyance of any portion of the land, the grantee has erected a dwelling house, corrals, etc., and has cultivated portions, more or less extensive, of his land. Ignorant of the dimensions of the tract within his exterior boundaries, or supposing, as was formerly not uncommon, that the whole tract within his exterior boundaries would be confirmed to him, he may have conveyed away portions remote from his houses and cultivations—the purchaser, perhaps, taking the risk of having the land purchased included in the survey— and, it may be, paying a price less than its value by reason of the uncertainty as to the location. But the grantee, or a subsequent purchaser under him, might. notwithstanding such a conveyance, insist that no location should be made so as to exclude his ancient dwelling house, his corrals, and his cultivated fields. He might urge, with great force, that it would be absurd to confirm his claim. because he had settled upon and improved it, and afterward to declare that his house and improvements were not upon his own, but upon public land. He might also urge that the erection of a house and corrals, the cultivation of the adjacent lands, especially when effected at great expense. and followed by a residence of many years, are acts which indicate an election far more unmistakeably and emphatically than any conveyances could do—and that subsequent purchasers of remote parts of the tract are affected with notice of the fact that, so far as his homestead and adjacent lands are concerned, the election is already made, and the location fixed. So, too, the purchaser of his house and improvements might reasonably claim that wherever the grant might finally be located, it ought, at all events, to include what the grantee had, by acts so notorious and unmistakeable, averred it to embrace; and that the location thus originally made by the grantee should not be affected by the execution of deeds, perhaps quit-claim, and without consideration, of which he, the pur-

chaser of the house and improved land, neither had nor could have had notice. If, in addition, we consider how readily frauds upon the purchaser of the homestead. or even upon settlers, (who naturally look to the house and settlement as determining the location of the grant,) might be committed by means of antedated conveyances, it will, I think, be apparent that the mere execution of deeds to purchasers cannot, in all cases, be accepted as an election by the grantee of the location of the land which is to be adopted by this court, by causing the survey to be made of the tracts so conveyed, including them successively, in the order of their dates until the whole quantity be obtained."

I have found no reason to doubt the correctness of these views, expressed more than eighteen months ago. It may be observed, in addition, that the duty of the United States is to locate this land, as nearly as may be, in the same manner as the magistrate called upon to give a judicial possession would or ought to have done, with such modifications only as are necessary to adapt it to the lines of public surveys, and to prevent the location from being unreasonably injurious to the public interests. It cannot be doubted that if a judicial possession of this rancho had been given, Castro would not only have the right, but would have been required to include within it his house and cultivations; and any sobrante that might have resulted would probably have been cut off on the side of the Mission of Santa Clara, so as to leave the remaining lands of that establishment, to which the Estrada tract originally appertained, in a compact form.

A portion of the two leagues granted to Estrada has been conveyed to Murphy by metes and bounds, who has presented his claim and obtained a separate confirmation for the tract conveyed to him. The confirmation to Castro was, therefore, for two leagues, excepting therefrom the land conveyed and confirmed to Murphy. There must, therefore, be surveyed to Castro, within his exterior boundaries. a tract sufficient to make up, with the lands of Murphy, the quantity of two leagues; such tract to be located so as to include his house and cultivations, and to be in a compact form.

